NICHIMEN CO., Inc., Plaintiff-Appellee,

v.

Leonard ASHBACH, Defendant-Appellant.

No. 15141.

United States Court of Appeals
Seventh Circuit.

Nov. 12, 1965.

Melvin E. Levinson, I. Harvey Levinson, Chicago, Ill., for appellant.

Ralph A. Mantynband, Louis M. Mantynband, Morrie Much, Chicago, Ill., for appellee, Arvey, Hodes & Mantynband, Chicago, Ill., of counsel.

Before HASTINGS, Chief Judge, and CASTLE and SWYGERT, Circuit Judges.

HASTINGS, Chief Judge.

Nichimen Co., Inc., plaintiff-appellee, brought this diversity action in the district court against Leonard Ashbach, defendant-appellant, Rose Jenkins and Roy C. Dahl. Jenkins and Dahl were subsequently dismissed as parties.

Nichimen sought to recover damages from Ashbach because of his alleged fraudulent conversion of certain radios, accounts receivable and the proceeds thereof allegedly the property of Nichimen.

After a trial to the court, without the intervention of a jury, the district court entered extensive findings of fact and stated conclusions of law favorable to Nichimen on all the issues. Judgment thereon was rendered for Nichimen in the sum of $79,113.71 against Ashbach, with a special finding that malice was the gist of the action. Ashbach appealed.

The errors relied upon for reversal arise out of the trial court's failure to dismiss the action as a matter of law; the insufficiency of the evidence to support the findings of fact and Nichimen's right to recovery; and the failure to find for Ashbach as a matter of law at the close of the evidence.

Based upon our review of the record and the findings of the trial court, we see that the following facts have been clearly established.

Ashbach was president, a director and the majority shareholder of the Wilcox-Gay Corporation, a Michigan corporation. He was also president and a director of Majestic International Corporation, an Illinois corporation, a wholly owned subsidiary of Wilcox-Gay.

Since 1950, Rose Jenkins had been a manager of Wilcox-Gay, in charge of its operations in Chicago. She was also an officer and manager of Majestic.

On or about July 18, 1961, Nichimen entered into a written contract with Wilcox-Gay for the sale to Wilcox-Gay of 10,000 AM–FM portable transistor radios, Model FX 408, to be shipped here from abroad. The purchase price was fixed at $25.30 each, before payment of customs duties and excise taxes, payment due net 30 days after arrival in the United States.

Between January 23, 1962 and March 8, 1962, the first 5,000 radios were delivered to Wilcox-Gay. On January 31, 1962, the agreement was modified by re-

ducing the price of the second 5,000 radios to $24.30 per set.

From and after February 23, 1962, Wilcox-Gay was in default in payment of certain invoices arising out of the sale of such radios.

On February 24, 1962, Jenkins made a written request to Nichimen on behalf of Wilcox-Gay for an extension of time for payment of the amount in default. Nichimen granted an extension of ten days.

On March 6, 1962, Nichimen notified Wilcox-Gay, Ashbach and Jenkins in writing that the ten-day extension had expired and that there was past due to Nichimen the sum of $25,551.96.

On March 20, 1962, Nichimen notified Ashbach and Jenkins in writing that as of that date an amount of approximately $76,000 was past due from Wilcox-Gay and granted a further extension of time for payment thereof to April 1, 1962.

From and after February 23, 1962, the date of the first default in payment by Wilcox-Gay, negotiations between the parties were entered into for the purpose of extending the time within which Wilcox-Gay was to make payment for said radios and securing the protecting Nichimen for the amounts past due and to become due in the future. These negotiations resulted in the preparation of a written agreement dated May 12, 1962.

This written agreement was executed on or about May 12, 1962, and by all signatories prior to June 21, 1962. Ashbach and the corporation general counsel executed for Wilcox-Gay, and Nichimen by its vice-president.

The provisions of the agreement of May 12, 1962 relevant to the issues in this case are set out in Finding 16, as follows:

"16. Said agreement provides by its terms *inter alia:*

'All merchandise purchased under the terms of Exhibits A, B, C, and D and all future purchases, but excluding all merchandise which, by prior agreement of the parties, is delivered to the Buyer at a place designated by the Buyer, shall be stored in a bonded public warehouse of Seller's selection at the Buyer's expense until such time as said merchandise shall be delivered to the Buyer at said warehouse. Title to said merchandise until delivery to the Buyer in accordance with the terms of this agreement shall remain in the Seller.' (Paragraph 4).

'* * * The Buyer agrees and certifies that upon release of merchandise to fill orders on hand, the Buyer will assign to the Seller accounts receivable resulting from the sale and delivery of such merchandise * * *' (Paragraph 5 (a)).

'With respect to merchandise on hand and already delivered by the Seller to the Buyer on Seller's invoice No.'s 1407, 1429, 1461 and 1494, the Buyer agrees to procure a bonded warehouse receipt in the name of the Seller for said merchandise. Buyer further agrees that on future shipments placed in the bonded warehouse it will cause bonded warehouse receipts to be issued in the name of the Seller. In respect to such merchandise under the bonded warehouse receipt the Seller shall authorize the warehouse to release merchandise upon the signature of Leonard Ashbach or Rose E. Jenkins or Roy C. Dahl, individually, or any of the two following: Sol H. Ashbach, Frank Sanchez, or Abel Alvarez.' (Paragraph 5(e))."

The district court found and held that by virtue of the agreement of May 12, 1962, title to the FX 408 radios and the accounts receivable resulting from their sale by Wilcox-Gay was in Nichimen.

In May, 1962, pursuant to the May 12, 1962 agreement, Nichimen delivered 3,000 of the second 5,000 FX 408 radios to a bonded public warehouse and a warehouse receipt was issued to Nichimen in its name.

On July 13, 1962, Nichimen made written demand on Wilcox-Gay and Ashbach for the assignment of accounts receivable, the inventory of FX 408 radios or payment of the balances due and owing Nichimen pursuant to the May 12, 1962 agreement. On July 27, 1962, the fair market value at wholesale of the FX 408 radios was $40 per unit. On June 21, 1962, Wilcox-Gay had in its possession at least 4,123 such radios.

The facts relating to the alleged fraudulent conversion can best be shown by setting out the findings of the trial court on this issue, as follows:

"22. Leonard Ashbach had notice on and prior to June 21, 1962, and was fully informed as to the contents of the relevant provisions contained in the agreement of May 12, 1962, and particularly the contents of those provisions which related to the fact that title in and to all the Model FX 408 radios was to remain in Nichimen Co., Inc. and to the contents of the provision that the accounts receivable resulting from the sale and delivery of said radios were assigned and were to be assigned by The Wilcox-Gay Corporation to Nichimen Co., Inc.

"23. On or before July 27, 1962, Leonard Ashbach did fraudulently convert and personally participated in the fraudulent conversion of the property of Nichimen Co., Inc., to-wit: 2,500 Model FX 408 radios which were the subject matter of the aforesaid agreement dated May 12, 1962, and accounts receivable resulting from the sale of said radios. Rose Jenkins, as agent for and under directions of Leonard Ashbach, negotiated a loan with Walter E. Heller & Company wherein it was proposed that Walter E. Heller & Company make a loan of $25,000 to Majestic International Corporation and, as an inducement for such loan, offered to pledge as collateral 2,500 of the Model FX 408 radios, the title to which was in Nichimen Co., Inc. at the time.

"24. On July 27, 1962, Rose Jenkins under the direction of Leonard Ashbach in carrying out said fraudulent conversion did on that date cause 2,500 of said Model FX 408 radios to be deposited in the Lawrence Warehouse in the name of Majestic International Corporation, and receipt #G-40278 was issued therefor; and further on or about said date Rose Jenkins, while acting as agent for and under direction of Leonard Ashbach, did cause said receipt to be delivered to Walter E. Heller & Company as collateral for a certain collateral note signed by Rose Jenkins on behalf of Majestic International Corporation, and did receive the sum of $25,000 from Walter E. Heller & Company on account of said note, which sum was deposited with the Continental Illinois National Bank & Trust Company of Chicago at Chicago, Illinois, to the credit of Majestic International Corporation.

"25. By this act of pledging said radios for $25,000 a first lien of that amount was fraudulently imposed upon property belonging to the plaintiff, to the injury and damage of plaintiff in the amount of $25,000.

"26. Subsequent to June 21, 1962, 1623 of the Model FX 408 radios which were not pledged to Walter E. Heller & Company were sold and the accounts receivable arising out of the sale of said radios aggregated $55,878.53. $54,113.71 of the aforesaid accounts receivable were assigned to Walter E. Heller & Company by The Wilcox-Gay Corporation (computation as to the amount of the assigned accounts receivable is in accordance with the stipulation of counsel heretofore entered during the trial of this cause). Said accounts receivable were pledged without the consent or knowledge of Nichimen Co., Inc. to Walter E. Heller & Company by Rose Jenkins acting pursuant to the direction of and in concert with Leonard Ashbach.

"27. Nichimen Co., Inc. never consented to or received notice of the delivery of said radios to the Majestic International Corporation or to the Lawrence Warehouse Company, or of the pledge of the aforesaid Lawrence Warehouse receipt, or the radios represented thereby to Walter E. Heller & Company.

"28. Nichimen Co., Inc. never consented to or received notice of the assignment to Walter E. Heller & Company of the accounts receivable arising out of the sale of said radios.

"29. On to-wit: October 28, 1963, this court in the cause entitled Nichimen Co., Inc. v. The Wilcox-Gay Corporation, 62 C 2099, entered a final judgment order specifically enforcing the provisions of the agreement of money judgment against The Wilcox-Gay Corporation and no part of which has been satisfied. Said judgment order is attached hereto as Appendix A and incorporated herein as though set out in full.

"30. Leonard Ashbach consciously, willfully, maliciously and fraudulently converted and personally participated in the fraudulent conversion of property belonging to Nichimen Co., Inc., to-wit: 2,500 Model FX 408 radios thereby defrauding the plaintiff of 25,000 and further the accounts receivable in the sum of $54,113.71 resulting from the sale of certain additional Model FX 408 radios, likewise defrauding the plaintiff of $54,113.71, making a grand total of $79,113.71.

"31. Rose Jenkins did not have full and complete knowledge of the legal status of the agreements between the plaintiff and The Wilcox-Gay Corporation and did not conspire to defraud the plaintiff, but at all times acted as the agent and under the direction of Leonard Ashbach.

"32. Leonard Ashbach consciously, willfully, maliciously and fraudu-

lently converted and did convert property belonging to Nichimen Co., Inc., to-wit: 2,500 Model FX 408 radios by imposing thereon a $25,000 first lien and accounts receivable in the sum of $54,113.71 resulting from the sale of certain additional Model FX 408 radios, making a total of $79,113.71.

"33. The actions of the defendant Leonard Ashbach in these circumstances were willful and malicious and in wanton disregard of the rights of Nichimen Co., Inc.

"34. Malice is the gist of the action."

We carefully reviewed the findings of the trial court in light of objections made by Ashbach. It is our considered judgment that the record amply supports the findings entered and that they are not clearly erroneous. Federal Rules of Civil Procedure, rule 52(a), 28 U.S.C.A.

The trial court properly found that the agreement of May 12, 1962 was completely executed prior to June 21, 1962 and was in full force and effect prior to the subsequent acts of conversion.

■■ We are convinced that the contract of May 12, 1962 reinvested Nichimen with title to the radios and accounts receivable. This was the express language of the agreement. The provisions for obtaining possession and control were merely to further secure and protect the title of Nichimen. There were no intervening rights of third parties involved in this transaction. In a sales contract of personal property, title is transferred from seller to buyer when the parties to the contract intend it to be transferred. Physical transfer is not essential to the passage of title. Mullen v. Farm Bureau of La Salle County, 21 Ill.App.2d 280, 285, 157 N.E.2d 679 (1959).

■ The acts of Ashbach, or those acting under his direction and control, in pledging radios to Heller, by assigning accounts receivable to Heller and by failing to remit proceeds of the accounts

were clearly fraudulent acts of conversion. These acts were done without the knowledge, consent or acquiescence of Nichimen, to its resulting loss and damage. Consequently, these acts clearly fall within the Illinois definitions of conversion. Donn v. Auto Dealers Investment Co., 318 Ill.App. 95, 109–110, 47 N.E.2d 568 (1943); Sprague's Collecting Agency v. Spiegel, 107 Ill.App. 508, 509, 511 (1903).

The record supports the award of damages in the amount of $79,113.71.

The question of whether malice is the gist of the action, as the district court found, is an important question, for on its answer depends the personal liberty of appellant. The Illinois insolvent debtors statutes, Ill.Rev.Stat. ch. 77 §§ 4, 5, 68 (1963), in effect permit the imprisonment of a judgment debtor if the judgment debt is the result of a civil action in which malice is the gist of the action.

■ The Illinois courts have provided some guidelines for interpretation.

"The term 'malice,' as used in the Insolvent Debtors Act, applies to that class of wrongs which are inflicted with an evil intent, design or purpose. It implies that the guilty party was actuated by improper or dishonest motives and requires the intentional perpetration of an injury or a wrong on another. * * * To entitle a defendant to be discharged from imprisonment it must appear that the wrong for which the action was brought was not of that character. The gist of an action is the essential ground or principal subject-matter without which the action could not be maintained." Seney v. Knight, 292 Ill. 206, 208, 126 N.E. 761, 762 (1920).

■ Malice, however, is not an essential element of conversion. Associates Discount Corp. v. Walker, 39 Ill.App.2d 148, 188 N.E.2d 54 (1963). It is clear that this action for conversion could have been brought against Ashbach without a claim that malice was the gist of the action. Nevertheless, the question yet remains whether malice is an essential element in the instant case.

In Greener v. Brown, 323 Ill. 221, 153 N.E. 825 (1926), the plaintiff in error, who was in custody pursuant to the Illinois debtors act, contended on appeal that the judgment of the circuit court was one for simple conversion, of which malice was not the gist. Two dissenting judges agreed, stating:

"In pleading the conversion it is not necessary to set out the particular means by which the conversion was accomplished, but a general allegation of conversion is sufficient. The gist of the action in case brought by defendants in error against plaintiff in error is the conversion of the funds. A wrongful intent is not an essential element of the conversion. * * * It being unnecessary to allege or prove the intent attending the conversion in order to recover, the characterization of the conversion in the declaration as fraudulent did not change the action to one where malice is the gist." Greener v. Brown, supra, at 226, 153 N.E. at 827.

This is essentially the position the appellant asserts here.

■ In the same case, however, the majority provided what is the law in Illinois:

"The action was one in tort based on fraudulent conversion. Malice, as that term is used in cases of this character, does not necessarily mean hatred or ill will, but pertains to wrongs which are inflicted with an evil intent, design, or purpose. Such malice may be shown by showing that the guilty party was actuated by dishonest motives with intent to perpetrate an injury. * * * That is the 'gist of the action' which constitutes the basis of the suit and without which the suit could not be maintainable." Greener v. Brown, supra, at 224, 153 N.E. at 826.

■ Even giving Ashbach a most liberal construction of the evidence, there is

substantial evidence showing that he, with a dishonest intent, inflicted a wrong upon Nichimen: malice is the gist of the action.

The judgment of the district court is in all respects affirmed.

Affirmed.